REYNOLDS v. INDUSTRIAL COMMISSION et al.

No. 5468.  Decided November 23, 1933.  (27 P. [2d] 28.)

*D. B. Hempstead,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., and *Grover A. Giles,* Deputy Atty. Gen., for defendants.

ELIAS HANSEN, Justice.

Plaintiff, on behalf of herself and minor daughter, applied to the Industrial Commission of Utah for compensation for the death of her husband, Sidney S. Reynolds.  A hearing was had and compensation denied.  Mrs. Reynolds prosecutes this proceeding to review and annul the order denying her compensation.  The commission denied compensation because, as it found the fact to be, the death of Sidney S. Reynolds "was due to coronary embolism of the heart which was not influenced in any degree by the injury to the scalp when he fell in the kitchen of the County Jail some three hours previous to the time of death."  Plaintiff contends

that the evidence taken before the commission was such as to require, as matter of law, a finding that the injury to the scalp of Mr. Reynolds caused or contributed to his death. Defendants contend to the contrary.

The evidence established, and the commission found, in addition to the finding as to the cause of death of Mr. Reynolds, the following facts:

"I. On March 4th, 1933, Sidney S. Reynolds, of 329 Fourth Avenue, Salt Lake City, Utah, was employed by Salt Lake County as a jailor, at a salary of $150.00 per month. The County had procured the payment of compensation to its injured workers, or their dependents in case of death, by insuring its liability with the State Insurance Fund. The said Reynolds was past 57 years of age, weighed 210 pounds and was not quite six feet tall.

"II. During the day of March 4th, 1933, while on shift, and particularly during the afternoon, Reynolds complained to Michael Mauss, his fellow jailor, of headache and of accumulation of gas. In the early afternoon he said to Mauss, 'I believe I will go up to the dispensary and take a dose of salts to see if I can get rid of that gas.' He went up and later returned. The record does not disclose whether or not he took the salts.

"III. Later on in the day, between 3:15 and 3:30 P. M., Reynolds went down to the kitchen and asked one James O. Maddox to fix up a drink of soda and water; that his stomach hurt him. The drink was prepared and Reynolds sat on a bunk and drank a part of it. After six or seven minutes, in reply to an inquiry, he said he felt better. He then arose and started toward the stairs. Maddox asked him if he were going upstairs, to which he made no reply. About this time he walked into the end of a table and fell backwards. Maddox tried to catch him as he fell, but failed to do so. In falling, he struck his head on a board shelf under another table which was about five or six inches from the floor. The head finally came to rest on the cement floor. He appeared to be unconscious. Help was summoned and after some five minutes he was lifted on one of the tables. His clothes were undone. The abdomen was found to be markedly distended. He had also, in striking the shelf, suffered a laceration about two inches long over the left temple region. The laceration did not extend to the bone but was moderately deep in the skin. It bled profusely. After a few minutes Reynolds had revived to a point where with assistance, he was able to walk to the toilet and after an evacuation he walked to a couch where he rested for about twenty minutes. He was then taken to the County Hospital.

"IV. Dr. Alexander found him perfectly conscious but very blue. His pulse was steady, rapid and almost imperceptible. He complained of intense pain in his stomach and right leg. His pupils were equal but somewhat dilated. His reflexes were present. He had no paralysis in either arms or legs. The man was in such a violent state of shock that the Doctor did not examine him further. The Doctor ordered that he be stimulated and external heat applied. The Doctor remained with him for twenty or twenty-five minutes but observed little change. The Doctor gave instructions to the interne and left for a short time. Before his return Reynolds died at 6:40 P. M. * * *

"V. An application was made by the defendants, thru Dr. Alexander, for a postmortem, for the purpose of determining the cause of death. Permission was refused by the applicant by reason of the fact that she could not secure assurance that a post-mortem examination would reveal with certainty the cause of death."

The evidence further shows that Mrs. Mary Maude Reynolds, the plaintiff herein, is the widow and that Leah Reynolds is the daughter of the deceased. Leah Reynolds was seventeen years of age on the day her father died. Both Mrs. Reynolds and the daughter, Leah, resided with and were dependent on Mr. Reynolds at the time of his death. No complaint is made of any of the findings excepting that relating to the cause of the death of Mr. Reynolds.

The death certificate which was received in evidence shows that he died from "Coronary embolism of heart." Dr. Clark Young testified on behalf of plaintiff. Drs. Robert J. Alexander and Martin C. Lindem testified on behalf of the defendants. Each of the doctors was examined touching the probable cause of the death of Mr. Reynolds, and each expressed an opinion concerning that matter. Dr. Young testified in substance as follows: That he knew Mr. Reynolds prior to his death and had served as his family physician; that he treated Mr. Reynolds for chronic winter bronchitis in December, 1931, and again in January, 1932; that during the winter the smoke, fog, and cold weather seemed to bring on him a chronic cough which cleared up during good weather; that at the times he treated Mr. Reynolds for bronchitis he examined his heart and tested his blood pressure; that both his blood pressure and

his heart were normal. In answer to a hypothetical question as to whether or not the fall and injury which the evidence showed Mr. Reynolds sustained just before his death was such as could cause an internal hemorrhage in his skull, Dr. Young answered, "Yes. That would be possible." In answer to the question "What are the probabilities?" Dr. Young answered, "It would depend on the region where the skull was hit and the exact type of fall. If he fell prone backwards I think there would be considerable force there, enough to cause a small fracture." Dr. Young, further testifying, gave the following answers to the following questions:

"Q. If this blow on the head which you have talked about was sufficiently severe to cause internal hemorrhage of the skull could that have caused his death? A. Possibly.

"Q. Assuming that the blow caused unconsciousness for a short time, a few minutes, and he afterwards regained consciousness and was conscious until he died, would that have been the course of internal hemorrhage of the skull, to have those symptoms? A. I didn't see him while he was sick and I don't know just what symptoms he presented, but it seemed possible it could have resulted directly in his death or at least contributed towards it, a blow of that severity. * * *

"Q. You think that that blow that he received on his head which has been described here and the circumstances surrounding it could have contributed to his death which occurred two hours and a half after he received the blow? A. Oh, yes, I think it could. * * *

"Q. Would you say doctor from the testimony given there was any evidence of disturbance to the brain tissue? A. Yes, from what they have said it can be entirely possible that the injury could have caused his subsequent behavior. He could have come out of this and later on lasped into unconsciousness.

"Q. Is that what you think occurred? A. That is as good explanation as I can formulate.

"Q. Would that cause in your opinion a coronary embolism? A. No, I don't think it would cause embolism. I don't see why it should.

"Q. You say it is possible. How much so? Very probable? A. No, but very improbable it would cause embolism. * * *

"Q. Is there any connection between coronary embolism and the blow on the head? A. Any blow, severe injury or blow you can get

a breaking off of a clot blood, or if he had varicose veins, or a clot in any other artery, it might break off and go to the heart. * * *

"Q. Do you think that an embolism did flow from this part? A. No, personally I don't think it did. * * *

"Q. In the absence of an autopsy and the death certificate showing coronary embolism have you an opinion whether or not that is a correct diagnosis? A. I can't say off hand. His death was entirely consistent with either coronary thrombosis, embolism, or fractured skull, or internal hemorrhage of the skull."

Following is a summary of the evidence of Dr. Robert J. Alexander: That Mr. Reynolds was brought to the county hospital about 4:30; that he immediately examined Mr. Reynolds; that

"his pulse was steady, rapid and almost imperceptible. He was complaining of intense pain in his stomach and also down his right leg. I asked him what happened and between very painful gasps he told me he was in the basement of the County Jail and all of a sudden he fell. * * * I found the laceration about two inches long over the left temple region directly above, about two inches above the ear. The laceration didn't extend to the bone at all. It was moderately deep in the skin. * * *His pupils were equal but somewhat dilated. His reflexes were present. He had no paralysis in the arms or legs. The man was in such a violent state of shock that I didn't feel I was justified in making any further examination. I immediately ordered that he be stimulated and external heat applied. I remained with him about 20 or 25 minutes and observed the progress of his condition, and I didn't see a great deal of change. * * * Before I could return Mr. Reynolds had died about 6:45."

Dr. Alexander further testified: That the wound on Mr. Reynolds' scalp was not serious; that it went about halfway through the scalp. That in his opinion Mr. Reynolds' brain tissue was not injured. That an embolism could not come from the scalp wound because an embolism from the wound must come through the veins and would lodge in the lungs and would not be coronary embolism. That "judging from the symptoms he presented the most probable diagnosis was coronary embolism or there may be a coronary occlusion there due to thrombosis." That

"there is a possibility there of a heart seizure or acute indigestion. * * * A large number of coronary embolisms or coronary occlusions are really diagnosed as acute indigestion; and individuals dying from so-called acute indigestion it is shown on autopsy to be coronary occlusion. And it is quite possible that Mr. Reynolds walked into the table as he had his first initial heart seizure. Whether the effect of the fall caused any hemorrhage in addition to the heart seizure that he had is problematical, but personally I don't think so. I think his death was due to coronary embolism or thrombosis."

That Mr. Reynolds would have died even though he had not struck his head on the shelf, for this reason,

"that Mr. Roynolds regained his consciousness; * * * but when he came down to the hospital he was entirely conscious with an extremely rapid pulse, and he had blueness, and the picture was very typical of coronary occlusion. If after the fall and striking his head had he suffered a subdural hemorrhage, he would have entirely regained consciousness. He would have been conscious for an hour or longer and during this period of consciousness the blood is leaking from one of the main vessels of the skull and the pressure presses on the brain, and the pulse becomes very slow and it may fall from 110 and come down to 60 or 70, and when the individual loses consciousness then the pulse runs away with itself, and the patient dies. But Mr. Reynolds didn't present this at all."

That a shock such as Mr. Reynolds appeared to have had might well have been caused by coronary occlusions and not by the fall. That he was not absolutely positive that Mr. Reynolds' skull was not fractured but in his opinion the skull was not fractured.

Dr. Lindem testified that he had heard the evidence in this case. He expressed the opinion that the fall and the head injury which Mr. Reynolds sustained did not cause or contribute to his death; that the probable cause of his death was an occlusion of the large blood vessel in the heart; that the symptoms described by the witnesses did not indicate that Mr. Reynolds sustained any brain injury by the fall.

There is other evidence to the same effect as that which we have thus summarized and in part quoted. It is not necessary, however, to dwell at greater length on the medical testimony. From what has been said, it is clearly apparent

that there was substantial competent evidence before the commission tending to show that the death of Mr. Reynolds was not caused or contributed to by the fall and injury which he sustained at the county jail. Having reached that conclusion, we are not at liberty to interfere with the findings of the commission. The Industrial Act limits the powers of this court to a determination of whether or not "(1) The Commission acted without or in excess of its powers. (2) If findings of fact are made, whether or not such findings of fact support the award under review." Laws Utah 1919, c. 63, pp. 164, 165, § 3148. The finding complained of being supported by substantial competent evidence, it follows that the order denying compensation should be, and it accordingly is, affirmed.

STRAUP, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.